IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN SHEETZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 12 C 8477 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| JULIE HAMOS, Director of the Illinois | ) | |
| Department of Healthcare and Family Services; | ) | |
| ERWIN McEWEN, Former Director of | ) | |
| Children and Family Services; TIMOTHY | ) | |
| EVANS, Chief Judge of Circuit Court of | ) | |
| Cook County, Illinois; LISA MADIGAN, | ) | |
| Illinois Attorney General, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

AND

| | | |
|---|---|---|
| BRIAN SHEETZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 12 C 8479 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| FORMER OFFICER HUMER, FORMER | ) | |
| POLICE CHIEF LAWLER, VILLAGE OF | ) | |
| BARRINGTON, FORMER OFFICER | ) | |
| MONTEMAYER #180, POLICE CHIEF | ) | |
| MURPHY, VILLAGE OF BARRINGTON | ) | |
| HILLS, FORMER SUPERINTENDENT | ) | |
| HERRMANN OF THE BARRINGTON | ) | |
| COMMUNITY UNIT SCHOOL DISTRICT 220, | ) | |
| and JOHN DOE # 1, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

These two *pro se* lawsuits were ostensibly filed by 19-year old Brian Sheetz, a learning-disabled college student. Both lawsuits arise out of the 1993 divorce of Brian's parents (Sheila Mannix and Daniel Sheetz) and their subsequent long-running custody battle in the Illinois court system. Although custody of Brian and his brother Kevin was initially given to Mannix in 1993, the state court in 2004 modified the divorce degree to give Mannix and Daniel Sheetz joint custody and then, in 2005, gave sole custody to Sheetz and severely restricted Mannix's access to her two sons.

Thereafter, Mannix, filed numerous *pro se* lawsuits challenging the 2005 custody ruling and other decisions by the state courts. After losing in state court, Mannix turned to federal court. To date, she has filed at least six lawsuits in the Northern District, all unsuccessful, naming as defendants numerous state court judges and other legal actors who participated in the earlier litigation.

Though we will not recount all the details of Mannix's federal litigation history, here are some highlights. In a 2005 case (No. 05-7372), Mannix moved for a temporary restraining order against four state court judges who had ruled against her in the custody decisions. Judge Kendall dismissed the lawsuit because the domestic relations exception to federal jurisdiction bars federal courts from adjudicating claims related to divorce and custody. On appeal, the Seventh Circuit affirmed and noted that Mannix's claims were also barred by the *Rooker-Feldman* doctrine because she was complaining that "the state judiciary has erred in her particular [state court] case." *Mannix v. Machnik, et al.*, Case Nos. 06-2120, 06-2369, & 06-2435, at p.2 (7th Cir. July 3, 2007). The core meaning of *Rooker-Feldman*, the Seventh Circuit explained, is "that federal district courts cannot review the merits of decisions made by state courts in civil litigation." *Id.*. The Seventh Circuit's opinion begins with this sentence: "Sheila Mannix is a disappointed litigant." *Id.* at 1. This global assessment of Mannix, it is worth noting, was made in 2007.

In 2009, Judge Shadur denied Mannix's IFP application, finding her complaint, 60 pages naming 60 defendants, to be frivolous. He noted that Mannix has an "obviously skewed view that the entire immediate universe is involved in a massive conspiracy to injure her." (09-103 Dkt. # 53 at 1.) In 2010, Judge Manning dismissed another case filed by Mannix. (10-3849.) In 2012, Judge Norgle dismissed yet another complaint, noting that the complaint was "a pocket encyclopedia of conspiracy theories, including allusions to the mafia and Nazis" and admonishing her "to bring an abrupt and certain end to her frivolous filings." (10-5063 Dkt. # 57 at 3, 5.)

This brings us to the two current cases. Both complaints are long and come with many attached exhibits. The 12-8477 complaint is 27 pages, asserts eight claims, and includes 277 pages of supplemental exhibits. The 12-8479 complaint is 32 pages, asserts 17 claims, and includes 151 supplemental pages. Although the two complaints vary in superficial ways, their gist is that when Brian was a minor, the defendants failed to protect him (and his mother and brother) from Brian's father and from the police and judges who were enforcing or issuing court orders. Both complaints contain vague and implausible claims about a massive conspiracy covering the entire Illinois family court system. To give a sense of the wide scope (both in time

and number of people) yet superficial and vague nature of these allegations, here is a representative sentence from one of the complaints:

> That Brian, Kevin, and/or Mannix sought protection from abuse and prosecution for criminal acts by Sheetz from the Lake County Sheriff, Cook County Sheriff, McHenry Country Sheriff, Villages of Barrington, Barrington Hills, Fox River Grove, Northbrook, and Arlington Heights police offices, Chicago police officers, Lake County State's Attorney, Cook County State's Attorney, Illinois Attorney General, and multiple judges in Cook Lake, and McHenry Counties on numerous occasions dating back to April 1996 to no avail.

(12-8477 Cmplt. at ¶ 19 (footnotes omitted.) The complaints mostly consist of a history of the state court litigation, recounting at length the motions and emergency petitions filed, quoting from briefs, summarizing procedural rulings made by the parade of judges who had one time or another ruled on these custody and divorce matters.

There are four sets of defendants in the two present cases, and they have all filed motions to dismiss, with opening and reply briefs. (12-8477 Dkt. # 18, 31; 12-8479 Dkt. # 28, 38, 42, 48, 49, 51.) These briefs are thorough and patiently and persuasively set out multiple reasons why each of the many counts should be dismissed. We agree with these arguments. The main overarching argument, however, which is the one relied on by the earlier judges in this district, is that we have no jurisdiction to hear these claims because they are barred by the *Rooker-Feldman* doctrine. As the Seventh Circuit explained in Mannix's 2007 appeal, this doctrine states that federal district courts cannot review the merits of decisions made by state courts in civil litigation. In these two cases, to grant Brian relief, this Court would effectively put this Court in the position of overturning rulings made by the state court cases.

Brian Sheetz (the nominal plaintiff, more on this below) argues in his two response briefs that he was a minor at the time of the events and not named as a party to the various rulings made in state court. However, as defendants correctly point out, *Rooker-Feldman* bars re-litigation of any injury resulting from, or "inextricably intertwined" with, the state court decisions. *See, e.g., Garry v. Geils*, 82 F.3d 1362, 1365-66 (7th Cir. 1996); *Epps v. Creditnet Inc.*, 320 F.3d 756, 759 (7th Cir. 2003). Here, Brian's claims would require this Court to essentially declare that the custody decisions made in 2005 and on other occasions were wrong in some respect. The two complaints repeatedly mention these decisions and, as noted above, mostly recount the state court litigation history. This focus thus shows that the state court rulings are the source of the harm.

Brian also argues that he can challenge the state court rulings because he was not a formal party named in those proceedings. But as defendants correctly point out, a court need not have personal jurisdiction over a child in order to enter a custody determination in divorce proceedings. (12-8477 Dkt. # 31 at 2, citing *In re Marriage of Schlam*, 648 N.E.2d 345, 350 (Ill. App. Ct. 1995) ("If [] personal jurisdiction over the child were required, a trial court hearing a

dissolution case would never be able to make a custody award unless the child were served with summons and made a party. This is not the case.").)

Brian's other argument to get around *Rooker-Feldman* is to claim that the state court rulings are void because they were procured by fraud. However, this argument fails because he offers nothing more than sketchy and conclusory assertions. As an example, here is the argument Brian makes in one of his response briefs: "All of the defendants' [] arguments fail because they all knowingly relied on void orders. They knew they were acting without authority of law and no probable cause." (12-8479 Pl. Resp. at p.19.) Beyond these boilerplate allegations, Brian only offers a few passing and cryptic references to a "judicial bribery scheme" (*id.* at ¶ 28), to a Sacato mob family informant (*id.* ¶ 18.b), to a connection with his grandmother in Connecticut (*id.* ¶ 17.b), and to what he calls the "Illinois' family court 'cottage industries.'" (12-8477 Pl. Resp. at ¶ 34). There is no continuity or explanation to these wide-ranging and implausible declarations, all of which have been raised in Brian's mother's earlier lawsuits. In sum, they are insufficient to prevent the application of *Rooker-Feldman*, and all of Brian's claims in the two lawsuits are barred for lack of jurisdiction.

The above analysis is based on the assumption that Brian, a 19-year old learning disabled college student, actually prepared and filed these two lawsuits by himself. Brian explicitly states that he filed these lawsuits "for myself alone" and "not for my mother." (12-8477 Pl. Resp. at 7.) His response briefs contain a number of statements, written in the first person, giving the impression to the Court that Brian wrote and researched these briefs. The following are a few examples:

•   Under the lenient pleading precepts embraced in Haines v. Kerner, I am of information and belief that my Complaint alleges sufficient facts portraying a cause of action under Counts VIII & IX. (12-8479 Resp. at ¶ 46.)

•   I found the following case among the many yellow and red flags on the Westlaw legal resource which summarizes that this issue is far from settled across the federal courts in the country, especially in light of the fact that I could be considered part of a class of victims in Illinois' family court "cottage industries" whose rights are being deprived under the color of law (including the case law cited by the Barrington Hills involving Judge Norgle). (12-8479 Resp. at ¶ 36.)

•   I think the main issue here is that I need leave to do discovery and then replead. After consultation with a high school board member in another district, I learned that District 220 probably has a security contract with the local police. I need to depose any employees of District 220 who may have spoken with the municipalities' police officers. I need to depose any employees of District 220 who may have spoken with any officers of the State court. I also learned how to find District 220's financial statements and audits on their website and to specifically look for federal funding into the school, especially regarding the special education programs about which I was deprived because I was

discriminated against as a victim of family court "cottage industry" racketeering activity. (12-8479 Response at ¶ 33.)

These sentences (and others in the briefs) repeatedly give the impression that Brian is the person doing the work to prepare these lawsuits. But it strains credibility to think that he (a 19 year old with learning disabilities) could have and would have done all this work at this time in his life. Did he truly conduct a nationwide Westlaw search for cases on point? When did he even learn how to use Westlaw? Did he truly go around speaking to school board members from other districts and sort through financial statements of school districts? The briefs are written using the terminology and style of lawyer-written briefs (*e.g.* "on information and belief" and "I need leave to do discovery and then replead"). When and how did Brian become familiar with such concepts? The briefs also provide details and quotes from briefs written by opponents in his mother's earlier cases, some which were litigated when Brian was a younger boy. Did he go back and read these briefs and legal rulings to cull out the relevant quotes? And what about the timing of these two lawsuits? They were both filed in October 2012. According to documents submitted by Brian, he would have started college in the fall of 2012.[1] This would mean that during the middle of his first semester in college, he inexplicably decided to take on the large task of researching, preparing, and drafting two lengthy complaints.

In short, it is implausible that Brian did this work. The likely scenario suggested by the circumstantial evidence is that Mannix prepared these lawsuits and used her son as a proxy to continue waging her litigation battles. If true, then she has placed her son at risk by having him sign complaints (if he did in fact sign them) containing false statements. We could further pursue these troubling allegations by requiring Brian and his mother to appear in Court to testify under oath. However, at this point, we conclude that such an effort would potentially do more harm to Brian and would further waste Court time.

For all the above reasons, these two lawsuits are dismissed for lack of jurisdiction under the *Rooker-Feldman* doctrine.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** January 15, 2014

---

[1] Brian states in his IFP application that in December 2011 he was accepted early decision and that, as of February 13, 2013, was a freshman at Roger Williams University. (12-8477 Dkt. # 13 at 1, 3.) This would presumably mean he began in the fall of 2012.